**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID E. DAUBENMIRE,** *et al.* | : | |
| | : | |
| **Plaintiffs,** | : | **Case No: 2.04-CV-01105** |
| | : | |
| **v.** | : | **JUDGE MARBLEY** |
| | : | |
| **CITY OF COLUMBUS,** *et al.* | : | **MAGISTRATE JUDGE KEMP** |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

## I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment. Plaintiffs David Daubenmire ("Daubenmire"), Charles Spingola ("Spingola"), and Thomas Meyer ("Meyer") filed suit in November 2004 against the following Defendants: City of Columbus ("City"), Sergeant Michael Piccininni ("Sgt. Piccininni"), Officer Todd S. Bush ("Officer Bush"), and John Does #1-5. Plaintiffs only remaining claim is for injunctive relief against the City so they may engage in future ceremonial burning.

For the reasons set forth below, the Court **GRANTS** Defendants' Motion for Summary Judgment.

## II. BACKGROUND

### A. Factual History

This case involves three Plaintiffs whose claims arise from incidents occurring from the year 2000 through the present. This Court has set forth the facts as they relate to: (a) the current open burn permit application process; (b) each Plaintiff's separate allegations; and (c) facts regarding the involvement of Michael B. Coleman as Mayor of Columbus ("Mayor Coleman").

## a. Open Burn Permit Application Process

The City of Columbus Fire Prevention Code ("CFC"), Title 25; Fire Prevention Code, Chapters 2501.01-2501.99, incorporates the Ohio Fire Code ("OFC") as amended periodically, "except for such parts which have been herein deleted or amended, as if set out at length herein." CFC § 2501.01(A). The OFC contains Chapters 1301:7-1-01 to 1301:7-7-34 of the Ohio Administrative Code. The minimum requirements of the OFC are the basis of the CFC, though more restrictive requirements may be imposed by the CFC. CFC § 2501.01(B).

The City's Division of Fire, Fire Prevention Bureau handles applications for open burn permits. Assistant Fire Chief Kerry Ellis ("Assistant Chief Ellis") is the Chief of the Fire Prevention Bureau. He replaced Assistant Chief Gregory Paxton in that position in 2005. Pursuant to the CFC:

> It shall be the duty and responsibility of the chief of the Fire Prevention Bureau, under the direction of the chief of the division of fire, to enforce the provisions of the Fire Prevention Code as herein set forth. *The chief of the Fire Prevention Bureau is the designated enforcement officer of this code and is herein referred to as the fire official*.

CFC § 2501.02(A) (emphasis added).

Pursuant to the OFC "Definitions" section, the "Fire Code Official" is the "designated authority charged with the administration and enforcement of the code, or a duly authorized representative."OFC § B-202. The OFC states what the Fire Code Official is authorized to do:

> The fire code official is hereby authorized to enforce the provisions of this code and *shall have the authority* to render interpretations of this code, and *to adopt policies*, procedures, rules and regulations in order to clarify the application of its provisions. Such interpretations, policies, procedures, rules and regulations shall be in compliance with the intent and purpose of this code and shall not have the effect of waiving requirements specifically provided for in this code.

> The fire official is *authorized to* receive applications, review construction documents and issue permits for construction regulated by this code, *issue permits for operations regulated by this code*, inspect the premises for which such permits have been issued and enforce compliance with the provisions of this code.

OFC § 104.1; 104.2 (emphasis added).

Assistant Chief Ellis testified at his deposition that in issuing or denying permits, it is not a matter of discretion as to whether someone is burning something symbolic; rather, the only issue is public safety. He asserted that future enforcement of the Fire Code will be content neutral as to message and targeted only to safety concerns. The current and future policy is that a permit that complies with the CFC (i.e. at least a certain number of feet from a structure) will be approved as long as the burning is not hazardous.[1]  It is the obligation of the Fire Prevention Bureau to ensure that the public is safe when a burning is proposed in the public domain.

Regarding the amount of discretion Assistant Chief Ellis has in issuing or denying permits, he testified in his deposition:

> If you came to me, you used a supposition and you wanted to burn a flag, first of all I don't care if it's a flag. I care if it's a tire probably, because of the pollution and the heat, the BTU's that are released from a tire. *So it's not matter of discretion as to are you burning something that's symbolic*. I'm not going to discriminate against whether you burn the gay flag or the Muslim – the [Koran] or whatever. *What I'm looking for is public safety*. . . . And if you came to me and said I want to burn a flag, and I want to douse it in gasoline and I want to set it on fire. I would suggest to you: "Why don't you just use a match? It's much safer." See, I'm not trying to tell you, "You can't do it." I would offer suggestions as to how I think you could safely do that. . . . I'm not there to stop your permit.

When a person seeks a burn permit, he must fill out an application. After submission of the application, the timetable could range from hours to days, based on whether the Ohio Environmental Protection Agency ("EPA") had already been notified of the burn. If the EPA had not already been notified, then how quickly the EPA approves of the burn depends on what

---

[1]**Prohibited open burning**. Open burning that is offensive or objectionable because of smoke or odor emissions or when atmospheric conditions or local circumstances make such fires hazardous shall be prohibited. OFC § G-307.1.1.

material is being used, whether there is an air quality alert, and whether there is compliance with their other guidelines. Following submission of the application and EPA approval, the battalion chief responsible for the proposed burn site area has to inspect that site to determine whether it is suitable for an open burn. As long as the site is deemed to be safe for the public pursuant to the conditions represented by the applicant, the burn permit will be approved. Upon approval, a physical paper will issue to the applicant. Thereafter, the battalion chief in that district can revoke the permit only if he observes noncompliance with the conditions of that permit.

The current "Application for Burn Permit," consists of three pages, two of which are instructional. Among other things, the application requires the applicant to indicate the proposed burn date, time, and location. The applicant is also asked to specify the type and quantity of material to be burned and how the material is to be ignited. As the "Specifications" section of the application indicates: "All requested specifications that *do not create or add to a hazardous condition* for persons or property *will be approved*. Any open burning conducted under this permit must be conducted in accordance with the specifications approved by the Columbus Division of Fire." The "Guidelines" section of the application also indicates: "Permits *will be approved* to the extent that the requested activity does *not create or add to a hazardous condition* for persons or property."

### b. Plaintiffs Spingola and Meyer

On June 23, 2001, Plaintiffs Spingola and Meyer traveled to downtown Columbus, Ohio to view the "Gay Pride" parade and to protest what they describe as, "the perverse celebration of the Homosexual lifestyle." As part of their protest, they intended to burn a "Homosexual flag"[2]

---

[2]When Plaintiffs refer to "Homosexual flag," they refer to the rainbow-colored flag that symbolizes gay pride and diversity. Throughout the rest of this Opinion, the Court will refer to the flag as the "Rainbow Flag."

on a public street near the intersection of Broad and High streets. Before they could begin, they were approached by Defendant police officer, Sgt. Piccininni who warned them not to burn the flag. Spingola allegedly responded to Sgt. Piccininni's order by saying this was his flag, that he was going to burn it, and that was a matter of free speech.

Plaintiffs allege that as soon as they ignited the flag, Defendant Sgt. Piccininni and another Columbus police officer arrested them without asking them if they had a permit or suggesting that a permit was required to burn a flag. Sgt. Piccininni testified at his deposition that he had already been notified that Plaintiffs did not possess a permit. Plaintiffs were charged with open burning without a permit, in violation of CFC § 2501.985 and OFC § F-403. They allege that City prosecutors and witnesses suggested repeatedly to them that they were being prosecuted only because they burned the flag without a permit, and that they could have easily obtained a burn permit had they only applied for one. Nonetheless, on November 18, 2001, the open burning charges were dismissed on constitutional grounds in the Franklin County Court of Common Pleas. The City appealed the Court of Common Pleas' decision. On March 18, 2003, the Franklin County Court of Appeals, Tenth Appellate District of Ohio reversed the dismissal and reinstated the open burning charges, finding OFC § F-403 to be constitutional. *See Columbus v. Meyer*, 786 N.E.2d 521 (Ohio App. 10 Dist. 2003). The Ohio Supreme Court denied review of the appellate court's decision on July 30, 2003. *See Columbus v. Meyer*, 792 N.E.2d 200 (Ohio 2003). Daubenmire was not named as a plaintiff in that case. All three Plaintiffs filed the instant Complaint on November 19, 2004, naming the City, Sgt. Piccininni and Officer Bush as Defendants.

Spingola also alleges that the City violated his Constitutional rights in 2004. According to Spingola, on June 26, 2004, he desired to attend the "Gay Pride" parade to try, once again, to burn a "Rainbow Flag" in protest. On June 9, 2004, he submitted a "Notification of Intent to Conduct Open Burning to the EPA" and "Application for Burn Permit" to the City Fire Division seeking permits to burn the "Rainbow Flag." In that permit, under burning location, he listed "Broad & High / Where ever political speech seems appropriate."

As of June 23, 2004, Spingola had still received neither verbal approval nor a written permit from the City. Seeking an answer, on June 23, 2004, Spingola's attorney called the City Prosecutor's office, not the Fire Prevention Bureau, to inquire why the City had not yet issued a burn permit to Spingola. Further, Spingola's attorney suggested to the Prosecutor's office that "litigation would follow" if the City denied Spingola's permit application.[3]

Following his attorney's contact with the City, on June 24, 2004, Spingola submitted a new "Application for Burn Permit" seeking the City's approval for two locations at 10:00 a.m. and 1:30 p.m., respectively, on June 26, 2004.[4] At the same time, Spingola's attorney had more contacts with "City officials regarding Spingola's applications." As of June 25, 2004, however, it was still unclear whether the City would issue Spingola's burn permits. Less than 24 hours before the "Gay Pride" parade, Spingola learned from City officials that the City would issue him burn permits.

---

[3] On Spingola's first permit, there is a notation at the bottom that states "I am disapproving this permit. Mr. Spingola stated he does not have to follow the rules per the U.S. Constitution." The comment does not specifically list which rules it is that Mr. Spingola asserted he doesn't have to follow, but notably, there is no time listed for the burning as required by the application, and the location states "where ever political speech seems appropriate."

[4] For this second application, he specifically listed the time and location for the proposed burns.

Nonetheless, Spingola claims that, despite being issued these permits, he still faced intimidation from the City of Columbus Police Division. He alleges: "Accompanied by at least 20 other City police officers and a fire investigator, one police officer approached me shortly before 1:00 p.m. on the parade route and threatened me with arrest if I did not begin my burn demonstration right at 1:00 p.m. He states, though, that in spite of the intimidation, he refused to start his burn before 1:30 p.m., as his burn application requested. He was not arrested that day or further hassled by any City officials.

### c. Plaintiff Daubenmire

Plaintiff Daubenmire is the founder of "Pass the Salt Ministries," a Christian ministry he claims is "devoted to upholding Christian Values in American Culture." On July 15, 2004, Daubenmire applied to the City for open burning permits for ceremonial burnings to be held in downtown Columbus on July 19 and July 23; he also notified the EPA of his intentions. Daubenmire's planned ceremonial burnings, to be conducted "in conjunction with other Christian leaders and groups who had traveled to Columbus from around the United States," included plans to burn the following materials at the following locations:

a) Outside of City Hall on July 19, 2004, the burning of the Koran (Holy Book of Muslims) and the burning of the ["Rainbow Flag"]; and

b) Outside of the federal courthouse on July 23, 2004, the burning of several United States Supreme Court decisions that are viewed by Christians as undermining Biblical morality and giving constitutional protection to sinful behavior.

Daubemire claims that he provided all the information that the City Fire Division and the EPA requested for the issuance of an open burning permit.[5] As such, when Daubenmire had not

---

[5]The record shows that the application was not submitted within the required ten days before the proposed burn. It was only submitted four days before.

heard from the EPA or the City, and when no one from any office or agency definitively denied his requests, he assumed that the City had approved his permit applications.

According to Daubenmire, on July 19, the date of his ministry's first planned ceremonial burning, the planned burn site was "surrounded [by] and monitored [by] dozens of City police officers." Daubenmire claims that the police officers "created an environment of great intimidation for the peaceful assembly of Christians." Moreover, before the ceremonial burning began, Daubenmire claims that a City official informed him that "[his requested] burn permit had been denied and that anyone who conducted an open burning would be arrested." Accordingly, Daubenmire cancelled the burning demonstration.

On July 20, Daubenmire and "at least one other Christian leader" met with City officials to challenge the denial of his burn permit and "to press for the issuance of permits for ceremonial burnings on subsequent days." According to Daubenmire, "at least one City official, whose name [he does] not recall, but who specifically told [them] during the meeting that he was speaking for the Mayor, stated [that the] burn permit had not been issued because [they] intended to burn the Koran and the City did not want to damage its good relations with the Muslim community." According to Daubenmire, only after the Christian leaders threatened a press conference to "expose to the community the expense incurred by the City for its passive police presence to monitor peaceful Christians the previous evening" did the City capitulate and agree to issue burn permits for July 22 and 23. Nonetheless, the City forced Daubenmire to reapply for the permits, which limited burning times to twenty minutes. Daubenmire alleges that this time restriction is an arbitrary limitation found nowhere in the City's open burning laws.

Daubenmire alleges that when he went to reapply for the burn permits, he met a City police officer named Kelly Hamilton ("Hamilton"). He claims he conveyed a clear understanding of what they were being put through, and Officer Hamilton pulled him aside and said to Daubenmire, "Don't let them do to you what they are trying to do to you. You have every right to do what you are doing." In Hamilton's affidavit, he does not state anything about this conversation. However, he states that he had a chance meeting with Assistant Chief Paxton on a day in July 2004 when a group of people were trying to obtain a permit to conduct an open burning. He states this conversation occurred when Chief Paxton was proceeding toward the exit of the building. Hamilton alleges that when he inquired if Chief Paxton was finished working for the day, Chief Paxton said he was told "not to be found." When Hamilton inquired what he meant, he alleges Chief Paxton explained he was given directions to be unavailable to review and grant any open burning permit. Specifically, Chief Paxton explained that he was to be unavailable for a group he referenced as wanting to openly burn the Koran. Chief Paxton also allegedly stated that the Mayor did not want the Koran being burned in his city.

On July 22, Daubenmire and the ministry carried out their first ceremonial burning "without incident," and, allegedly, one City official even indicated that he had extended the time for the burning ceremony. On July 23, the ceremony included a "procession to the federal courthouse where [they] intended to burn the Supreme Court decisions in a safe container on the public sidewalk." Before the procession arrived there, however, Daubenmire claims that the City officials informed the Christian leaders that their burn permit had expired. Thereafter, "[a]t least some of the assembly returned to City Hall, where one Christian leader burned the Supreme Court decisions and was arrested."

**d. Mayor Coleman**

Mayor Coleman has been the Mayor of the City of Columbus since January 1, 2000. He has therefore been in office during all of the events relevant to this case. Although he remembers hearing about a flag burning incident at the "Gay Pride" parade during his time in office, he was never a witness to any of the open burning demonstrations and he has not been engaged in any policy discussions or enforcement discussions regarding the CFC and flag burning. The enforcement policy for such issues lies in the Division of Fire. The entire process of applying for open burning permits and how they are granted, including how they are enforced, is handled by the Division of Fire. They are the final word on everything concerning permits.

Mayor Coleman remembers being involved in discussions about security for a large demonstration in downtown Columbus in 2004. He remembers they were concerned about the issues of security and violence. He recalls that a group of people was coming into town to protest and that they wanted to be on City Hall steps or ground; however, he doesn't remember the "why" or the "what for's." He remembers they had a lot of amplification equipment because he could occasionally hear them from his office. He does not remember any advance discussions on the issue of open burnings or permits.

After the group of people arrived, Mayor Coleman was aware of discussions that occurred between protesters and the City's Community Relations Commission, including the fact that some of the demonstrators desired to burn a copy of the Koran as part of their demonstration. He was not involved in any of the discussions with the protestors. He also remembers there were discussions in which there was concern regarding potential violence between the protestors who would burn the Koran and a group of Muslims nearby. The issue was

making sure the parties would be safe in exercising whatever free speech rights they had. Mayor Coleman states he was not involved in any discussions regarding burn permits and has never been involved in approving or disapproving burn permits. Ultimately, the persons who wanted to burn the Koran were issued a burn permit and burned the Koran without incident.

## B. Procedural History

Plaintiffs filed suit on November 19, 2004 against Defendants pursuant to 42 U.S.C. § 1983. In Plaintiffs' first cause of action, Plaintiffs Daubenmire and Meyer asserted that Defendants violated their First, Fourth, and Fourteenth Amendment rights in connection with their arrests and prosecution for open burning without a permit on June 23, 2001. In Plaintiffs' second cause of action, all three Plaintiffs sought injunctive relief against the City so that they may engage in future ceremonial burning. And in Plaintiffs' third cause of action, all three Plaintiffs sought a declaratory judgment against the City, claiming that their First and Fourteenth Amendment rights had been violated and that the City's policies and practices regarding open burning permits are unconstitutional. Defendants filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

On March 1, 2006, this Court granted Defendants' Motion. This Court held that Meyer and Spingola were collaterally estopped from asserting their first cause of action, and furthermore, that they failed to allege a prima facie case of selective enforcement. *Daubenmire v. City of Columbus*, 452 F.Supp. 2d 794, 804-10 (S.D. Ohio 2006). This Court dismissed Plaintiffs' second cause of action for injunctive relief against the City, concluding that the Plaintiffs lacked standing at the pleading stage. *Id.* at 811-12. And finally, this Court concluded that it would not exercise its discretionary jurisdiction under 28 U.S.C. § 2201 to determine

whether the City violated Plaintiffs' First and Fourteenth Amendment rights. *Id.* at 812. Plaintiffs appealed this Court's dismissal.[6]

On November 7, 2007, the Court of Appeals for the Sixth Circuit reversed this Court's dismissal of Plaintiffs' second cause of action for injunctive relief, but affirmed this Court's dismissal in all other respects. *Daubenmire v. City of Columbus*, 507 F.3d 383 (6th Cir. 2007). The Sixth Circuit allowed that "*at least during the initial phase of the case while the court ruled on the motion to dismiss*, Plaintiff's allegations were sufficient to support their standing to maintain a claim for injunctive relief." *Id.* at 389 (emphasis added). Thereafter, this matter was remanded to this Court for further proceedings consistent with the Sixth Circuit decision.

Pursuant to the Sixth Circuit decision, the only remaining issue is whether the Plaintiffs are entitled to injunctive relief. On June 2, 2008, Defendants moved for summary judgment on this sole remaining issue.

## III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart*

---

[6]Officer Bush was dismissed as a defendant in connection with Defendants' Motion to Dismiss, and Plaintiffs did not appeal his dismissal.

*v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). But the non-moving

party "may not rest upon its mere allegations." Fed.R.Civ.P. 56(e); *see Celotex*, 477 U.S. at 324;

*Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present

"significant probative evidence" to show that there is more than "some metaphysical doubt as to

the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV. LAW AND ANALYSIS

Plaintiffs bring their claim for injunctive relief under 42 U.S.C. § 1983, which provides:

Every person who under color of any statute, ordinance, regulation, custom or usage, of
any State. . . subjects, or causes to be subjected, any citizen of the United States or other
person within the jurisdiction thereof to the deprivation of any rights, privileges, or
immunities secured by the Constitution and laws, shall be liable to the party injured in an
action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "By its terms, § 1983 creates no substantive rights; it merely provides

remedies for deprivations of rights established elsewhere," such as the Constitution. *See*

*Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000) (citing *Oklahoma City v. Tuttle*, 471

U.S. 808 (1985)).

Plaintiffs do not challenge the constitutionality of the CFC, which was already found by

Ohio courts to be constitutional despite its incidental limitations on expressive activity such as

flag burning.[7] The CFC (which incorporates the OFC) itself is clear: it does not provide that the

symbol being burned can be considered in permit issuance and leaves no discretion for

differential treatment based on the symbol being burned. The only open burning that is

prohibited is, "[o]pen burning that is offensive or objectionable because of smoke or odor

---

[7]If Plaintiffs are in any way attempting to challenge the Fire Code, this Court affirmed in *Daubenmire,* 452
F. Supp. 2d 794 that because the state court had already heard and denied the Plaintiffs arguments that the Fire Code
was an impermissible infringement of the First Amendment, Plaintiffs are barred from bringing a § 1983 claim based
on issues already litigated in state court. *Id.* at 807.

emissions or when atmospheric conditions or local circumstances make such fires hazardous . . ."
*See* Ohio Adm. Code § 1301:7-7-03(G)(1)(a); OFC G-307.1.1. Any differential treatment policy based upon the intended or symbolic message of the individual conducting an open burn is therefore not in compliance with the OFC.

Plaintiffs seek an injunction against the City's alleged policy of burdensome and differential treatment in the granting, withholding, denying, and revoking of ceremonial burn permits based on the intended or symbolic message. Plaintiffs assert that unless the Court grants them injunctive relief, they face "an undeniable threat of confusion, intimidation, standardless discretion and/or content based discrimination from City officials should they apply for burn permits." Defendants assert that the City has no policy of using the CFC to deny permits for expressive burning. In fact, the application for open burn permits clearly states that permits may be issued for expressive burning. Defendants argue that Plaintiffs are not entitled to seek injunctive relief based on their unsupported speculation that some unidentified City employees might violate Plaintiffs' constitutional rights if Plaintiffs were to apply for open burn permits in the future.

## A. STANDING

In order for a federal court to exercise jurisdiction over a matter, the party seeking relief must have standing to sue. *Kardules v. City of Columbus*, 95 F.3d 1335, 1346 (6th Cir. 1996). The constitutional requirements for standing emanate from Art. III of the U.S. Constitution, which grants federal courts jurisdiction over "cases" and "controversies." *Id.* In order to meet the Article III standing requirements, a plaintiff must show that:

(1) he has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

(2) the injury is fairly traceable to the challenged action of the defendant; and

(3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*See Am. Civil Liberties Union of Ohio, Inc. v. Taft*, 385 F.3d 641, 645 (6th Cir. 2004). The Court

of Appeals for the Sixth Circuit has laid out the standard for determining whether a plaintiff has

satisfied these three constitutional elements:

> The party invoking federal jurisdiction bears the burden of establishing these elements. Since they are *not mere pleading requirements but rather an indispensable part of the plaintiff's case*, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., *with the manner and degree of evidence required at the successive stages of the litigation*. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.

*Kardules*, 95 F.3d at 1346 (citations omitted) (emphasis added) (citing *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 561 (1992)). In an earlier ruling in this case, the Sixth Circuit held that

based on the pleadings, the Defendants allegations were sufficient to demonstrate a significant

possibility of future harm. *Daubenmire*, 507 F.3d at 389. However, the issue of standing is now

before this Court at this summary judgment stage, and the Plaintiffs must support their

allegations of standing with evidence.

Once a plaintiff's standing is challenged in a motion for summary judgment, generalized

allegations will not suffice. *Ctr. For Biological Diversity v. Lueckel*, 417 F.3d 532, 537 (6th Cir.

2005). "[T]he plaintiffs must, in the words of Rule 56, Fed. R. Civ. P., 'set forth specific facts,'

in affidavits or through other evidence, demonstrating that each element of standing is satisfied."

*Id.* (citing *see Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 884 (1990)).

To satisfy the "injury in fact" requirement in a suit for injunctive relief, "a plaintiff must show actual or present harm or a *significant possibility of future harm* in order to demonstrate the need for pre-enforcement review." *Nat'l Rifle Assoc. of Am. V. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (emphasis added).[8] Plaintiffs do not allege they are suffering actual or present harm in seeking this injunction, but rather, a significant possibility of future harm.

As a threshold matter, to establish a significant possibility of future harm, Plaintiffs must establish that they will again apply to conduct a ceremonial burning pursuant to the permit application process. Plaintiffs Spingola and Daubenmire have each engaged in this permit application process once in the past, though none of the Plaintiffs has applied for a permit in four years. Plaintiffs have all set forth affidavits, however, stating that they plan to conduct future ceremonial burnings that require them to go through this process. Therefore, this is sufficient to establish they will participate in the permit application process in the future.

Next, Plaintiffs must demonstrate that when they participate in the permit application process in the future, there is a *significant possibility* that they will be subjected to differential treatment. To establish this, Plaintiffs must set forth specific facts showing either that: (1) all officials involved in the permit application process always will engage in differential treatment; or (2) the City ordered or authorized such officials to act in such a manner. *See Lyons,* 461 U.S. at 106; (cited by *Farm Labor*, 95 F.Supp.3d 731-32). In *Lyons*, the plaintiff alleged that he

---

[8]The inquiry into whether there is a case or controversy "obviously shade[s] into those determining whether the complaint states a sound basis for equitable relief" as the basic requisites for equitable relief are "the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)*; see Farm Labor Org. Comm. v. The Ohio State Highway Patrol*, 95 F. Supp.2d 723, 730 (N.D. Ohio 2000) ("there is not much that separates the injury in fact element of Article III standing from the need to show 'likelihood of substantial and immediate irreparable injury' as a prerequisite to obtaining an injunction").

feared he would be subjected to unlawful conduct by the city again. 461 U.S. at 107 n.8. The

Supreme Court, however, rejected this notion, stating:

> The reasonableness of Lyons' fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct. *It is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions*. The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant.

*Id.* (emphasis added); *see also Rizzo v. Goode,* 423 U.S. 362, 372 (1976) (a claim of injury is

insufficient if it rests upon "what one or a small, unnamed minority of policemen might do to

[plaintiffs] in the future because of that unknown policeman's perception" of departmental

procedures)*; Hange v. City of Mansfield, Ohio*, 257 F.App'x 887, 891 (6th Cir. 2007) ("the mere

subjective fear that a plaintiff will be subjected again to an allegedly illegal action is not

sufficient to confer standing");. Past wrongs do not in themselves amount to that real and

immediate threat of injury necessary to make out a case or controversy regarding injunctive

relief. *Lyons*, 461 U.S. at 102; *Farm Labor*, 95 F.Supp.2d at 730.

Evidence of a relatively few instances of violations by individual police officers,

"without any showing of a *deliberate policy* on behalf of the named defendants," does not

provide a basis for equitable relief. *Lyons*, 461 U.S. at 104 (emphasis added); *see, e.g., Coleman

v. Dep't of Rehab. and Corr.,* 46 F.App'x 765, 772 (6th Cir. 2002) ("absent a deliberate policy,

no injunctive relief is available" and in that case, there was "no policy to enjoin")*; Hange*, 257

F.App'x at 891 ("in order for a person to have standing to seek an injunction, the individual must

allege a substantial likelihood that he or she will be subjected in the future to the allegedly illegal

policy" and in that case there was "no indication that the City has a policy" of issuing the

complained of punishment); *cf. Warshak v. U.S.*, 490 F.3d 455, 466 (6th Cir. 2007) (recognizing

the plaintiff had standing for equitable relief because there was "no dispute about the existence of [a government] policy"). Only when the threatened act that will cause injury is "authorized or part of a policy, [is it] significantly more likely that the injury will occur again." *Warshak*, 490 F.3d at 466. Therefore, in this case, Plaintiffs must show more than a few instances of alleged past differential treatment in the permit application process; Plaintiffs must put forth specific facts establishing a deliberate policy of the City authorizing such misconduct.

A policy is something made either by lawmakers or by those whose edicts or acts may fairly be said to represent official policy. *Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008). "A single decision by a decision maker with *final authority in the relevant area* may constitute a "policy" attributable to the municipality. However, the municipality is liable for an official's unconstitutional action only when the official has *final authority to establish municipal policy with respect to the action*." *Hussein v. City of Perrysburg*, 535 F.Supp.2d 862, 869 (N.D. Ohio 2008) (citing *Pembauer v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986) (emphasis added); *see Ford*, 535 F.3d at 496 ("Municipal liability may attach for policies promulgated by the official vested with *final policymaking authority* for the municipality").

As there is no written policy authorizing or approving discriminatory treatment in the permit application process, the question is whether anyone with policymaking authority made a decision that could constitute a policy. Plaintiffs argue that there are two potential policymakers: either the Mayor or the Assistant Fire Chief of the Fire Prevention Bureau (Assistant Chief Ellis, formerly Assistant Chief Paxton).

There have been no facts presented to establish that Mayor Coleman is a policymaker in this area of burn permits. It is true that in general, the chain of command would end ultimately at

-18-

the Mayor. However, the key is who has "final authority in the relevant area." *Hussein*, 535

F.Supp.2d at 869. If a permit application is disapproved because it does not meet CFC provisions

or it poses a safety risk and the disapproval is not resolved, then the appeal goes to the Assistant

Fire Chief of the Fire Prevention Bureau. Assistant Chief Ellis did not testify that he is

responsible to the Mayor, that he ever submits burn permits to the Mayor, or that he ever

receives directives from the Mayor.

Mayor Coleman testified that the entire process of applying for open burning permits and

how they are granted and enforced is handled by the Division of Fire. He testified as well that

the Division of Fire is "the final word" on everything concerning permits. Therefore, even if

Mayor Coleman didn't want a permit to be issued, there have been no facts presented to establish

that he can force the Division of Fire to not issue a permit or regulate how they distribute

permits. The OFC confirms this, as it does not vest enforcement authority in a mayor. There is

no regulation or rule suggesting that Mayor Coleman would have any authority relating to fire

prevention. Even assuming that Mayor Coleman said all the things he is alleged to have said in

2004, as he did not have any authority in this area, he was not making policy, just expressing

opinions. In fact, as the permit to burn the Koran *was in fact issued*, this belies any notion that

he, allegedly wanting it to not be issued, had control over the process.

Assistant Chief Ellis is the Chief of the Fire Prevention Bureau, and as such, is the

"designated enforcement officer of [the CFC] . . . [and] the fire official." *See* CFC § 2501.02(A).

The "fire code official" has the authority to "adopt policies" . . . "in order to clarify application

of [the OFC]." OFC § 104.1. The "fire official" is also "authorized to . . . issue permits for

operations regulated by this code." OFC § 104.2. No one else is granted any authority pursuant

to the CFC or OFC to adopt policies pertaining to the CFC or to issue permits under the CFC. Assistant Chief Ellis confirmed that as the fire official, he possesses the authority for enforcement of the CFC. Therefore, he is the final policymaker pertaining to issues concerning the CFC, and in particular, issues concerning burn permits.

Construing the facts in the light most favorable to the Plaintiffs, the only fact presented against the Assistant Fire Chief was that former Assistant Fire Chief Paxton was trying to make himself unavailable to grant a burn permit for persons seeking to burn the Koran. However, this single instance fails to establish a policy of discriminatory treatment in the burn application process. There is no indication that former Assistant Chief Paxton ever told any of the employees under his command to not approve the 2004 burn permit or make themselves unavailable. And, as testified by current Assistant Fire Chief Ellis, other lower level people in his bureau handle issuing open burning permits. Assistant Fire Chief Ellis has never, in his three years at his current position, been directly involved in the permit process for issuing burning permits. Therefore, even if former Assistant Fire Chief Paxton made the decision to hide out to avoid dealing with a burn permit, there is no indication that this in any way affected Plaintiff Daubenmire's burn permit application. In fact, when he went to the Fire Prevention Bureau to obtain a permit, it was granted, and he did not state that he was delayed or hassled in any way. So this belies any notion that former Assistant Chief Paxton's actions burdened Plaintiff Daubenmire in any way. Regardless of this single action, no facts establish a policy of burdening ceremonial burn permit applicants.

Furthermore, Assistant Fire Chief Ellis testified that current and future enforcement of the CFC will be content neutral as to message and targeted only to safety concerns. He stated

that in issuing or denying permits, it is not a matter of discretion as to whether someone is burning something symbolic; rather, the only issue is public safety. The current and future policy is that a permit that complies with the CFC (i.e. at least 50 feet from a building) will be approved as long as conditions do not make such a fire hazardous. Following approval, a permit will issue to the applicant. Thereafter, the battalion chief in that district can revoke the permit only if he observes noncompliance with the conditions of that permit. As Ellis is the Chief of the Fire Prevention Bureau and final policymaker regarding issues concerning burn permits, these statements are the official policy of the Bureau.

Plaintiffs also allege in their Response to Defendants' Motion for Summary Judgment that there is a policy of failing to train police officers in the enforcement of the Fire Code. A municipality's failure to train its employees can also constitute a policy. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). In order to constitute a policy, however, that failure to train must reflect a "deliberate or conscious" choice. *Id.* This means Plaintiffs must set forth facts to support there is an "obvious potential" for constitutional violations on the part of the City due to insufficient training. *See Plinton v. County of Summit,* 540 F.3d 459, 464 -65 (6th Cir. 2008).

Plaintiffs Complaint only mentions three contacts with police officers to attempt to establish a failure to train. First, Sgt. Piccininni arrested Spingola and Meyer for open burning without a permit. Second, an unidentified police officer threatened Spingola with arrest if he didn't begin his burn demonstration a half hour before his permit time. And third, an unidentified police officer told Daubenmire that his permit had expired.

Chief Ellis stated that police officers work hand in hand with the fire investigators during big events, like the "Gay Pride" parade, to prevent fires. Before the "Gay Pride" parade at which

Spingola and Meyer were arrested, the police department consulted the Division of Fire. They traded information and the police officers were informed about the open burning prohibitions. Specifically, the Division of Fire informed them about the dangers of open burning, especially in a large crowd. They also informed them that an open burning was allowed if the person conducting the open burning had obtained a permit. Sgt. Piccininni inquired as to whether any permits for open burning had been given for locations on the parade route or downtown on that day, and he was informed that there were none. So, he knew that Spingola did not have a permit when Spingola conducted his open burn later. This fails to set forth any facts showing inadequate training.

With respect to the unidentified officer who threatened Spingola with arrest unless he started his burn demonstration earlier, there have been no facts presented that any other city official knew of any alleged threat or approved of any threat being made. As the officer then failed to carry out any threat, there is no support in the record that the official had the authority to make any threat. The lone statement by an unidentified police officer does not show that there was inadequate training.

Finally, regarding the unidentified officer who told Daubenmire that his permit was expired, Daubenmire never disputes that the permit was in fact expired. Therefore, as there is nothing indicating that this police officer was not justified in this statement and in full compliance with the law, this does not show inadequate training. Through these three instances of police contact, Plaintiffs have failed to set forth specific facts showing that there was an obvious potential for constitutional violations on the part of the City due to insufficient training.

This case is ultimately similar to *Coleman*, 46 F.App'x 765. In *Coleman*, the plaintiffs wanted an "overbroad, blanket injunction" enjoining the state of Ohio from violating prisoners' constitutional rights. *Id.* at 772. [9] The Court held it would not issue such an injunction because, "there [was] no policy to enjoin." *Id.* And, a blanket statement disapproving of violations of persons' constitutional rights is "cumulative . . . and unnecessary and outside the scope of this Court's jurisdiction." *Id.* at 773. In this case as well, there is no policy to enjoin. The Defendants appear to be seeking a blanket injunction enjoining the City from violating ceremonial burners' First Amendment rights. Such a blanket statement is cumulative of the rights already established in the First Amendment and is not needed.

In conclusion, there have been no facts presented to support that the City has ordered or authorized discriminatory treatment of burn permit applications. Furthermore, the policymaker with authority over burn permits, Assistant Chief Ellis, has stated that there is no discretion to issue burn permits based on the symbol being burned. Even if Plaintiffs were differentially treated in the past, as such past actions were not pursuant to City policy, Plaintiffs are unable to show that there is a significant likelihood they will be subjected to differential treatment in the future if they apply for a burn permit. As Plaintiffs cannot show this, they have not established an "injury-in-fact" which is required for Article III standing. Therefore, Defendants' Motion for Summary Judgment is **GRANTED**.

## V. CONCLUSION

For the foregoing reasons, this Court **GRANTS** Defendants' Motion for Summary Judgment as to the sole remaining claim for an injunction against the City.

---

[9]Specifically, the plaintiffs wanted an injunction "making it clear such violations of prisoners' constitutional rights by corrections officers cannot and will not be tolerated." *Id.*

**IT IS SO ORDERED.**

                         **___s/Algenon L. Marbley___**
                         **ALGENON L. MARBLEY**
                         **UNITED STATES DISTRICT COURT**

**Dated: October 24, 2008**